**Alfred and Judith POLAINO**

v.

**BAYER CORPORATION, et al.**

**No. CIV.A.97–CV–11420–RGS.**

United States District Court,
D. Massachusetts.

Nov. 13, 2000.

David B. Kaplan, Kaplan/Bond Group, Boston, MA, for Plaintiff.

Frank W. Beckstein, III, Larson & King, LLP, Boston, MA, Maia A. Moran, Dona Feeney, F.J. McDonald, Law Offices of F.J. McDonald, Boston, MA, Thomas R. Murphy, Roche, Heifetz, Murphy & Wholley, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO STRIKE AND MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On June 23, 1997, Alfred Polaino, an x-ray technician at the New Bedford Veteran's Administration Hospital (VA), brought this Complaint against the AGFA division of Bayer Corporation (AGFA), X.R. Imaging Network, Inc. (XRI), and White Mountain Imaging (White Mountain). Polaino alleges that he contracted an acute respiratory illness from chemical fumes emitted by an x-ray film processor and mixer manufactured and distributed by the defendants.

The Second Amended Complaint is framed on claims of a breach of the implied warranty of merchantability, negligence, and loss of consortium.[1] The Complaint alleges, in somewhat indiscriminate fashion, that the defendants collectively "sold and [negligently] installed the film processor and chemical mixer" without a device to warn "that there was no water in the mixture as required."

### PROCEDURAL HISTORY

On June 9, 1999, the defendants filed motions for summary judgment.[2] The undisputed facts insofar as relevant to these motions are as follows. In the fall of 1996, the VA purchased a Curix Compact Plus x-ray processor from AGFA. The AGFA processor permitted a technician to load x-

---

1. Judith Polaino, a named plaintiff, is Alfred Polaino's wife.

2. At a December 11, 1997 scheduling conference, the court ordered that dispositive motions be filed no later than November 19, 1998. On June 25, 1998, the court allowed a joint motion to extend the deadline to March 15, 1999. No dispositive motions were filed prior to the deadline, and the court set the case for trial on June 28, 1999. On June 10, and 11, 1999, the defendants sought leave to file dispositive motions late. On June 16, 1999, the court ordered the defendants to show cause why the plaintiffs should be put to the time and expense of opposing the late-filed motions. On June 25, 1999, the court allowed the delayed filing after reviewing the defendants' submissions.

ray cassettes without touching the film. The VA also acquired an IS–199 White Mountain chemical mixer from XRI. The White Mountain mixer automatically dilutes the processing chemicals with water and delivers a calibrated solution to the processor. The mixer is, however, a non-essential component. A technician has the ability to manually add the proper mix of water and chemicals directly to the processor.

In November of 1996, a VA employee and an AGFA representative installed the processor. During the installation, employees from XRI arrived with the mixer. It is not clear who installed the mixer. On December 13, 1996, Polaino began using the new equipment, processing six to eight x-ray exposures daily. On December 24, 1996, Polaino experienced sleeplessness and shortness of breath. His condition worsened, causing him to miss work. His treating physician (Dr. Bundy) determined that he was suffering from interstitial pneumonitis. Polaino returned to work on January 7, 1997. On January 21, 1997, an XRI service representative discovered that the water line to the mixer had been shut off. (He also discovered that an overflow line had never been installed). As a result, undiluted chemicals were being delivered from the mixer to the processor. Polaino believes that fumes from these undiluted chemicals caused his respiratory illness.

On November 4, 1999, the court heard oral argument on the defendants' motions. On December 10, 1999, the court allowed the motions in part, holding: (1) that Polaino had waived any duty to warn claim; (2) that the design defect claim was untenable against AGFA, which had no role in the design, manufacture, or distribution of the mixer; and (3) that Polaino's negligent installation claim against White Mountain ("and so much of the breach of warranty claim that relies on a similar premise")

should be dismissed because White Mountain had played no role in installing the equipment. The court also found Polaino's expert disclosures deficient, observing that:

> [d]efendants' main argument, however, is that Polaino has failed to identify an expert witness competent to testify to a design defect in the mixer or to establish a link between Polaino's medical complaints and the mixer's design or installation.... [Fn 8: I assume that Polaino intends to establish the feasibility of an alternate design by pointing to the AGFA processor which, in fact, is armed with a water alarm. Even if that were sufficient, Polaino would still need to establish that exposure to the *undiluted* chemicals used in the mixer, as opposed to the chemicals generally, caused his ailments.]

> While the court would ordinarily find Polaino's failure to comply with Rule 26 fatal, it is mindful of the fact that it has forgiven the defendants' prior disregard of the court's scheduling order in permitting them to file their summary judgment motions late. In fairness, Polaino should be given a similar second bite at the apple. The court will reopen the discovery schedule as follows. Polaino will have 45 days to designate appropriate experts on causation and to file a proper Rule 26 statement. Defendants will have 45 days thereafter to depose plaintiffs' experts, if they choose. Summary judgment motions may be filed 30 days thereafter, limited, however, to the issues of design defect and causation.

Polaino thereafter designated two expert witnesses: Dr. Harvey M. Cohen and Dr. Robert J. Bundy. On April 17, 2000, AGFA filed a motion in limine to preclude the testimony of Dr. Cohen and Dr. Bundy. On April 19, 2000, White Mountain and XRI followed suit with a joint motion seeking to exclude Dr. Cohen's testimony on different grounds.[3] The court heard

---

**3.** White Mountain and XRI also joined AGFA's motion to exclude Dr. Cohen's testi-

mony.

oral argument on the motions on September 28, 2000.

## DISCUSSION

As pruned by the court's prior rulings, the Second Amended Complaint alleges a design defect claim against White Mountain and XRI, as manufacturer and distributor, respectively, of the mixer, and negligence and breach of warranty claims against XRI and AGFA alleging improper installation of the mixer. White Mountain and XRI have moved, pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to exclude Dr. Cohen's testimony to the extent that it is being offered in support of the design defect claim. AGFA also challenges Dr. Cohen's opinions regarding general and specific causation.

█ *Daubert*, and two subsequent cases, *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), have radically altered the approach of the federal trial court to expert testimony. In *Daubert*, the Supreme Court abandoned the general acceptance test of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), finding it superseded by the more flexible relevancy test of Fed.R.Evid. 702. "That the Frye test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence." *Daubert*, supra, at 589, 113 S.Ct. 2786. *Daubert* imposes on a federal trial judge the duty to act as a "gatekeeper," guarding the fact-finding process against infiltration by "expertise that is fausse and science that is junky." *Kumho Tire*, 526 U.S. at 159, 119 S.Ct. 1167 (Scalia, J., concurring). See also *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir.1993). Two gateposts frame the exercise of a judge's discretion to admit or exclude expert testimony. First, the proffered expert must be shown to be sufficiently qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Second, the Federal Rules of Evidence require that the judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but [also] reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. "[T]he trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id., at 592–593, 113 S.Ct. 2786.

█ Stated more simply, the trial judge must first determine that the proffered expert is in fact qualified by training or experience to render an opinion. In that respect, the trial judge's task is no different under *Daubert* than it was under *Frye*. The trial judge must also insure that the expert's opinion is based upon "more than subjective belief or unsupported speculation.... Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Expert testimony, of course, takes different forms. Least troubling to the judge is an opinion based on the interpretation of data that are not in dispute. An economist, for example, opining as to a plaintiff's lost future earnings, will ordinarily reach her conclusions using a generally accepted actuarial model based on the plaintiff's life expectancy, his past earnings history, and certain assumptions about the plaintiff's residual earning capacity and the prevailing discount rate. In this instance, it is not the expert's methodology that might be suspect, but the reasonableness of the assumptions that she has factored into her actuarial model. Doubts about the validity of her ultimate conclusions will almost al-

ways be resolved by a fact finder exposed to "[v]igorous cross-examination ... and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. At the more troubling end of the spectrum is expert opinion expressed in the form of a scientific hypothesis, typically involving causation, derived from data that are disputed, or from historical facts whose meaning is subject to debate. In this latter instance, the judge is obligated to scrutinize not only the expert's methodology but also her ultimate conclusions. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512. "Thus, while methodology remains the central focus of a *Daubert* inquiry, this focus need not completely pretermit judicial consideration of an expert's conclusions. Rather, trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 81 (1st Cir.1998). The judge must finally determine that the expert's opinion has the capacity to assist the fact finder in deciding a material fact. See *Rotman v. National Railroad Passenger Corp.,* 41 Mass.App.Ct. 317, 320, 669 N.E.2d 1090 (1996) (where an expert witness testifies that a causal relationship is "possible," "conceivable" or "reasonable," that opinion, standing alone, does not satisfy a plaintiff's burden of adducing legally sufficient proof that a fact is more likely true than not true).

### DR. COHEN'S PROFFERED TESTIMONY

■ Dr. Cohen is a chemist with a Ph.D. from the Massachusetts Institute of Technology. He is certified by the American Board of Industrial Hygiene in the Chemical Aspects of Industrial Hygiene. Dr. Cohen proposes to testify that because of a design defect in the mixer, elevated levels of chemical fumes may be released without warning into the work environment. He further believes that Polaino's illness was caused by such a release. In formulating his hypothesis, Dr. Cohen spoke with Polaino and his attorney. He also reviewed Polaino's medical records, AGFA's *User Manual for the Curix Compact Plus,* the processing equipment service records, safety data regarding the processing chemicals, and "additional literature regarding occupational health problems relating to x-ray photographic film processing."

More specifically, Dr. Cohen believes that the mixer is defectively designed because it is not equipped with an audible and visible alarm warning an operator of an impeded water flow.[4] Dr. Cohen's Rule 26 report, in pertinent part, states that Polaino:

> relied exclusively on the warning system of the mixer to alert him to the necessity of adding additional chemical (developer and/or fixer). There was no such warning system at the mixer regarding the water level in the rinse tank and/or the availability of water for diluting chemicals in the mixer....

> According to the User Manual section on "Safety precautions," the user should, "Avoid inhaling chemical vapours. Make sure that the machine's working environment is sufficiently ventilated: air changes should be 10 times the room space per hour." ...

> It is likely that Mr. Polaino was exposed to an abnormally high concentration of chemicals utilized to process the x-rays. This due to use of chemicals

---

4. Dr. Cohen also maintains that the processor's user's manual fails to give adequate notice of the potential danger posed by undiluted processing chemicals. The court, however, has previously ruled that Polaino waived any duty to warn claim.

approximately 5 times as concentrated as recommended as a direct result of the water having been shut off and not available for dilution. Of particular concern in this regard are the chemicals acetic acid, glutaraldehyde, and sodium sulfite as well as potassium sulfite (potential sources of sulfur dioxide), all of which have been implicated as causative agents in occupational respiratory illness. Generally, the higher the concentration of these agents the greater the harmful effect, including the causation of respiratory illness. In general, concentration of such contaminants should be reduced to the lowest practical level by engineering controls. These should include, *inter alia,:*

1. Controlling the source, to allow the minimum escape of chemicals into the working environment (especially the worker's breathing zone). This requires substituting less dangerous material where practical and certainly would require ensuring adequate dilution of chemicals in the mixer. Mixing of chemicals often involves the production of heat, which tends to raise the temperature of the mixture, thereby increasing the evolution of volatile substances into the air (e.g., acetic acid, glutaraldehyde, sulfur dioxide) and increasing their concentration in the work environment. As one example, heat should be produced in the mixing of the components of Autex Developer Replenisher, Concentrate. Water acts as a cooling agent during such mixing, thereby reducing the overall rise in temperature and also reducing local hot spots, local areas of high concentration of chemicals, and gas evolution, during the mixing procedure, all of which would tend to reduce the evolution of volatile material. Accordingly, the recommended water of dilution is a major factor in

reducing evolution of harmful volatile material.

2. Providing effective ventilation. Ventilation should be sufficient to reduce the level of volatile contaminants to acceptable levels by diluting them with fresh air. Special attention must be given to the direction of travel of contaminants so that high levels of contaminants do not pass by the worker's breathing zone prior to being diluted. Often a local exhaust at the source of emission is necessary to draw the vapors away from the worker's breathing zone. The User Manual states that the room in which the processing is done should be ventilated with a minimum of 10 air changes per hour. I have no evidence that Mr. Trimmer or anyone else at AGFA took any steps to ensure proper ventilation prior to installation of the processing and mixing units. In this respect, it is relevant that after Mr. Polaino's departure in January of 1997, additional ventilation was added in the form of a local exhaust over the mixer....

**Conclusions:** Based on the above, the following represent my conclusions at this time....

8. White Mountain Imaging manufactured a mixer with both audible and visible alarms to designate when the supply of chemicals constituting the developer and fixer were low, but provided no mechanism to ensure that water was delivered as required for the appropriate dilution of the chemicals. Because of the importance of water, with respect to safety as well as cost and quality, this represents a defect in design of the mixer.

As defendants point out, Dr. Cohen has no experience or training in the field of mechanical engineering, nor has he ever designed a mechanical device with moving parts.[5] Perhaps more telling, Dr. Cohen

---

5. Dr. Cohen did participate in the "design" of the formulation of certain chemical abrasives

by selecting the proper additives.

has never seen the accused mixer, nor has he inspected or tested an exemplary model. At his deposition he could not describe the mixer's design, only its general function.

Dr. Cohen's lack of qualifications is underscored by his failure to investigate the facts upon which his hypothesis of an unarmed release of a high concentration of fumes is based. Dr. Cohen never ascertained: (1) how the mixer was vented; (2) whether the chemicals are processed in an open or closed system; (3) the temperature at which the mixer operates; (4) whether fumes are in fact released when the equipment is operated with undiluted chemicals; and (5) if they are, whether they are released at elevated levels.[6] Dr. Cohen's ultimate conclusion that Polaino was exposed to a toxic event because of a supposed design defect thus rests on unverified assumptions, speculation and guesswork. His testimony on this issue must therefore be excluded, and with it the design defect claim.

■ AGFA has also moved to preclude Dr. Cohen from testifying as to specific and general causation. In his Rule 26 report, Dr. Cohen states that his conclusion that Polaino's illness resulted from toxic exposure is based on Dr. Bundy's diagnosis of Polaino's illness as Reactive Airways Dysfunction Syndrome (RADS). Dr. Cohen determined (from the manufacturers' literature) that the processing chemicals contain acetic acid and glutaraldehyde. From several articles provided by Dr. Hodgson (Polaino's previously excluded expert), Dr. Cohen learned that acetic acid and glutaraldehyde can provoke RADS. Because Polaino's purported RADS symptoms manifested themselves shortly after the mixer was installed, Dr. Cohen concluded that the two events were causally related.

According to Dr. Bundy and Dr. Hodgson, it is likely that Mr. Polaino developed airway hyperactivity due to exposure to chemicals from the fixer and/or developer. According [to] the information provided by Mr. Polaino, these chemicals included, *inter alia*, sodium sulfite, hydroquinone, ammonium thiosulfate, acetic acid, aluminum sulfate and glutaraldehyde. The latter was not cited in Dr. Bundy's report, but was a component of the developing chemicals described in the MSDSs furnished to us. According to literature furnished by Dr. Hodgson, irritating substances, including acetic acid are known to produce occupational asthma in the form of RADS. [G]lutaraldehyde has been implicated as causing immunologic sensitization in some exposed workers who were diagnosed as having occupational asthma or who describe work-related respiratory symptoms. [Curran, et al. "Clinical and Immunologic Evaluation of Workers Exposed to Glutaraldehyde," Allergy 51: 1996: 826–32.] According to cited references, "glutaraldehyde has emerged as the main cause of occupational asthma among healthcare workers." [Di Stefano, et al., "Occupational Asthma Due to Glutaraldehyde," Monaldi Arch Chest Dis.1998: 53: 50–5.] Sodium sulfite and potassium sulfite, under acid conditions can release sulfur dioxide, another irritant that can produce respiratory symptoms. . . .

As suggested by Dr. Bundy, the temporal relationship between the onset of Mr. Polaino's symptoms and his exposure to [ ] elevated concentrations of chemicals known to cause respiratory problems strongly suggests a causal relationship. The improvement in his condition during his absence, his feeling of some distress on his return, especially during the one episode when the local exhaust fan failed, and his further improvement on completely leaving the environment is further evidence of the deleterious effect

6. Dr. Cohen also failed to conduct a cost benefit analysis of his suggested design alternative.

of the chemicals on his respiratory system. . . .

**Conclusions:** Based on the above, the following represent my conclusions at this time. . . .

6. As a direct result of the lack of water to the mixer, Mr. Polaino was exposed to elevated concentrations of substances known to cause occupational asthma, including acetic acid, glutaraldehyde, and probably sulfur dioxide.

7. Respiratory illness such as occupational asthma, hyperactive airways and reactive airways disease syndrome are consistent with exposure to elevated concentrations of substances such as acetic acid, glutaraldehyde, and sulfur dioxide.

Dr. Cohen's reasoning completely ignores the standard protocol used to extrapolate from a theoretical toxic risk to a real world conclusion about causation.

First, the toxicologist should analyze whether the disease can be related to chemical exposure by a *biologically plausible* theory. Second, the expert should examine if the plaintiff was exposed to the chemical in a manner that can lead to absorption into the body. Finally, the expert should offer an opinion as to whether the dose to which the plaintiff was exposed is sufficient to cause the disease.

*Reference Manual on Scientific Evidence,* (Fed. Jud. Center 1994), at 201.

It is an axiom of toxicology that an assay of an individual's actual or probable exposure to a toxic agent "is essential in determining the effects of harmful substances." Id. at 206. Exposure can be measured or estimated in one of three ways.

First, where direct measurements cannot be made, exposure can be measured by mathematical modeling, in which one uses a variety of physical factors to estimate the transport of the pollutant from the source to the receptor. . . .

Second, exposure can be measured using direct measurements of the medium in question—air, water, food, or soil. . . .

The third approach directly measures human receptors through some form of *biological monitoring,* such as blood levels or a urinary metabolite, which shows pollutant exposure.

Id.

Dr. Cohen's fundamental error was his failure to do a source analysis, that is, he never determined the actual concentrations (if any) of acetic acid and glutaraldehyde emitted by the processing equipment when operated with undiluted (or diluted) chemicals. Consequently, he is unable to estimate through modeling (or any other technique) the dose to which Polaino could have been exposed. Dr. Cohen's hypothesis, in a classic illustration of the *post hoc ergo propter hoc* fallacy, rests on the temporal proximity between the installation of the mixer and the onset of Polaino's disease, and to a lesser degree, on scientific articles associating acetic acid and glutaraldehyde with RADS. In sum, Dr. Cohen's testimony cannot prove that Polaino was exposed to a toxic agent, much less that he was exposed to a sufficient dose to produce a RADS response.

## DR. BUNDY'S PROFFERED TESTIMONY

■ Defendants also object to the expert testimony of Dr. Bundy, Polaino's treating physician, that Polaino suffers from workplace RADS.[7] Dr. Bundy's Rule

---

7. Polaino maintains that Dr. Bundy reached a diagnosis of RADS through differential diagnosis, an accepted medical technique. See *Baker v. Dalkon Shield Claimants Trust,* 156 F.3d 248, 252–253 (1st Cir.1998). That may be, although one would not know it from Dr. Bundy's very cursory report. Moreover, while differential diagnosis is a useful means of distinguishing one disease from another with similar symptoms, it is not a technique typically used to investigate the cause of an illness. It is one thing to say that Polaino has RADS. It is something altogether different to say, as Dr. Bundy does, that Polaino's RADS was caused by workplace exposure to acetic acid.

26 report, which consists of a two page letter, is deficient in several respects. Dr. Bundy, as a pulmonologist, is arguably unqualified to testify as to general causation (he professes to have no training in toxicology or epidemiology). More significantly, Dr. Bundy's conclusion that Polaino's RADS[8] was caused by "work inhalation exposure ... [to] acetic acid" is based on the same fallacy (proximity) to which Dr. Cohen fell prey.[9] Like Dr. Cohen, Dr. Bundy did nothing by way of investigation to establish whether Polaino was in fact exposed to acetic acid in his workplace. Thus, at least in this latter aspect, his testimony too must be excluded.[10]

*ORDER*

For the foregoing reasons, defendants' motions to strike the testimony of Dr. Cohen in its entirety and Dr. Bundy's testimony as to specific causation are *ALLOWED*. Because, plaintiff without such testimony can prove neither a design defect nor causation, summary judgment will enter for defendants on all claims.

SO ORDERED.

8. Defendants point out that Dr. Bundy was mistaken when he referred in his Rule 26 report to Polaino's condition as Reactive Airways *Disease* Syndrome.

9. In its December 10, 1999 opinion, the court observed that:

Polaino [had] submitted a May 22, 1997 letter from a pulmonary specialist, Dr. Robert Bundy, who treated him on January 11, 1997, stating that "by temporal relationship of the onset of his symptoms and the known exposure to the increased concentration of the previously listed multiple chemicals at his workplace, it is my opinion that there is a definite occupationally-related component to this new, severe respiratory impairment." Polaino also submitted a letter from a Dr. Michael Hodgson opining that "Polaino has airways hyper-reactivity resulting from his exposure to acetic acid at work." Although Dr. Hodgson recalled examining Polaino, he stated that he could not write a formal report without accessing his "initial history and physical examination, [his] notes, and the various letters," which obviously he had not done. Neither of these letters satisfy the strictures of Rule 26.

10. Dr. Bundy states that RADS is caused by "massive toxic inhalation exposure" but his office notes do not indicate that Polaino complained of any exposure to chemicals. Nor does his objective testing indicate chemical exposure. Defendants argue that Dr. Bundy's diagnosis lacks a scientific basis because he did not perform a "methacholine challenge test," which Dr Bundy agrees is the "gold standard" non-invasive test for RADS. Bundy Depo. at 44. Polaino contends that a methacholine test was performed by Dr. Hodgson. The flaw in the argument is that Dr. Bundy was unaware of the test or its results prior to preparing his Rule 26 report.