Frances L. COLEMAN and Howard
R. Coleman, Plaintiffs,

v.

Jerzy DYDULA and Alicija
Dydula, Defendants.

No. 96–CV–0244C(H).

United States District Court,
W.D. New York.

Feb. 22, 2001.

John J. Fromen, Buffalo, NY, for Plaintiffs.

Sliwa & Lane (Stanley J. Sliwa, of counsel), Buffalo, NY, for Defendants.

## INTRODUCTION

CURTIN, District Judge.

Frances Coleman and Jerzy Dydula were involved in a motor vehicle accident on Buffalo's East Side in March 1993. In the present action, Frances Coleman ("plaintiff") claims that Jerzy Dydula and his wife, Alicija Dydula ("defendants"), are liable for personal injuries that she suffered as a result of that accident. The case is before this court on the basis of diversity jurisdiction.

In the summer of 2000, the court learned of defendants' objection to one of plaintiff's expert witnesses, Dr. Ronald Reiber. Dr. Reiber is a professor of economics at Canisius College and has been retained by plaintiffs' counsel, John Fromen, Esq., as an expert witness on the issue of economic damages. On August 8, 2000, the court directed counsel for defendants to file a *Daubert* motion regarding Dr. Reiber's proposed testimony. Item 82. Accordingly, defendants, by their counsel, Stanley Sliwa, Esq., filed the present motion in September 2000. Item 87.

At about the same time, on August 31, 2000, plaintiff filed a motion seeking an order granting partial relief from an order of Magistrate Judge Carol E. Heckman issued on September 8, 1999. Item 58. On January 18, 2001, the court heard oral argument on the *Daubert* motion and considered the motion seeking relief from the Magistrate Judge's order as submitted without argument. *See* Item 104. In this order and opinion, the *Daubert* motion shall be considered first.

## DISCUSSION

### I. The *Daubert* Motion

Defendants seek to exclude Dr. Ronald Reiber's testimony regarding Mrs. Coleman's ("plaintiff") lost future wages, future costs of health care coverage, and worklife

expectancy.[1] Defendants argue that Reiber's opinions on these issues must be excluded because plaintiffs have not, and cannot, establish that this proffered testimony is sufficiently "reliable" under *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

## A. *Standard of Law*

The Federal Rules of Evidence set forth the standard for admissibility of expert testimony: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. The trial judge is to act as a "gatekeeper" with respect to expert testimony to ensure that such testimony is both relevant and reliable. *See Daubert*, 509 U.S. at 589–91, 113 S.Ct. 2786. This rule applies not only to scientific knowledge, but also to technical or other specialized knowledge. *See Kumho*, 526 U.S. at 141, 119 S.Ct. 1167. The determination as to the relevance and reliability of such evidence is committed to the sound discretion of the trial court. *See id.* at 158, 119 S.Ct. 1167.

*Daubert* sets forth specific factors, such as "testing, peer review, error rates, and 'acceptability' in the relevant scientific community," which the trial court may consider in determining reliability. *Kumho*, 526 U.S. at 141, 119 S.Ct. 1167. However, the *Daubert* test is flexible and its "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* To this end, the Supreme Court has more generally explained that trial courts should "make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167.

Furthermore, the trial judge must insure that the expert's opinion is based upon "more than subjective belief or unsupported speculation.... Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Expert testimony is reliable where it has "a traceable, analytical basis in objective fact...." *Bragdon v. Abbott*, 524 U.S. 624, 653, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

Finally, it is within the trial court's discretion to craft reasonable criteria to be used to determine reliability in a particular case and whether the proposed testimony meets those criteria. *See Kumho*, 526 U.S. at 158, 119 S.Ct. 1167 (decision to exclude expert evidence within trial court's discretion where based on "failure to satisfy either *Daubert*'s factors *or any other* set of reasonable reliability criteria").

In this case, defendants insist that the three areas of Reiber's challenged testimony—future lost wages, future health insurance costs, and worklife expectancy—fail to meet *Daubert* and *Kumho Tire*'s requirement of reliability.

---

1. While defendants did address a few other areas of Reiber's testimony in his moving papers, they have focused primarily on the three subject areas of future lost wages, health insurance costs and worklife expectancy. Further, defendants essentially abandoned these other objections in their reply affidavit and focused even more intently on Reiber's opinions regarding future lost wages, increased health insurance costs and worklife expectancy.

## B. *Future Lost Wages and Health Insurance Costs*

The court will take up Reiber's testimony on future lost wages and health insurance costs together because defendants attack the proffered testimony on these issues with substantially similar arguments. The similarity of defendants' arguments on these two issues likely owes to the fact that Reiber calculated future lost wages and increases in health insurance costs by using very similar techniques.

Reiber has explained two alternate wage growth rates for the next 18 years: 3 percent and 7.3 percent. For the first wage growth rate (3 percent), Reiber referred to the past ten years of the Consumer Price Index for Urban Consumers ("CPI–U"). Based largely on this data from the CPI–U, Reiber estimated that there would be 3 percent annual inflation from now until 2018. Based on the principle that wages rise with inflation, Reiber inferred that plaintiff's wage growth rate would also have been around 3 percent. Alternatively, Reiber derived a 7.3 percent growth rate by referring to the increases in pay that plaintiff received from 1992 through 1997, which is when she stopped working as a result of her disabilities. Reiber extrapolated plaintiff's probable wage growth rate from 1997 until 2018 based on what her wage growth rate had been from 1992 until 1997.

In much the same way, Reiber looked to the CPI–U's Medical Price Index ("CPI–M") in order to project future increases in the costs of health insurance coverage. Reiber sampled the last ten years of the CPI–M and concluded that the cost of health insurance would increase 4 percent annually until the year 2018.

## 1. *Scholarly Support for Reiber's Techniques.*

As to Reiber's projections for wage growth and health insurance costs, defendants challenge Reiber's testimony on two counts. First, defendants challenge Reiber's method of calculating future rates of inflation. Second, defendants challenge the principle that there is a correlation between inflation and wage growth, and a similar correlation between the inflation of medical costs and the cost of health insurance. Defendants argue that Reiber has not supported these methods and techniques with citation to a learned treatise, article, or other scholarly publication. Moreover, defendants complain that Reiber's methods on future lost wages and health insurance costs have never been published and, as a result, have never been subjected to peer review and scrutiny.

As a general matter, Reiber insists that there is no need to cite scholarly literature supporting his methodologies and techniques because his methods for calculating future lost wages and health insurance costs are fundamental, basic, run-of-the-mill economics. Reiber states that he teaches these principles to his students at Canisius College. Reiber also avers that these methods and techniques are widely known and accepted among forensic economists. *See* Item 94, ¶¶ 15–16.

Reiber nevertheless goes on to explain how he calculated plaintiff's lost wages with a basic formula of economics known as the "sum of annuity" formula. Item 94, ¶¶ 17, 22. In order to determine future lost wages through this formula, an economist plugs values into several different variables, which then yields a total figure for future lost wages. One of the variables in the sum of annuity formula is the "growth rate" for wages.[2] Defendants do

---

**2.** The sum of annuity formula appears as follows: $W \, C[\,(1 + g)n - 1 \,/\, g]$. Item 94, Exh. 1, ¶ 17.

not bicker with Reiber's use of the sum of annuity formula. Instead, defendants challenge the way in which Reiber derived that formula's growth rate variable. Item 95, ¶¶ 20–21.

Reiber defends his proffered 3 percent growth rate by asserting that basic economic theory led him to forecast future inflation rates by looking to historical data from the CPI–U. Further, Reiber says that economists generally agree that the rate of the CPI–U is synonymous with the nation's rate of inflation. Item 94, ¶¶ 26–29.[3] Next, Reiber contends that it is "axiomatic" that inflation (i.e., the CPI–U) and wages tend to rise and fall together. Item 94, ¶ 25. Thus, Reiber states that it is unnecessary to cite to scholarly literature supporting the assertion that the CPI–U can be used to derive a growth rate for future wages. Item 94, Exh. 1, ¶¶, 24–25.

As further support, Reiber cites a forensic economics treatise in which the authors note that historical CPI data "can be used" to estimate future growth of wages. See Item 94, Exh. 1, ¶ 34 (citing Item 94, Exh. 1, Att. F § 4.17). Later, Reiber cites the same textbook to support the idea that the CPI–M can be used to estimate the future growth of health insurance costs. See id. ¶ 35 (citing Att. F § 4.20). Reiber also cites to a 1996 article from the National Association of Forensic Economists ("the NAFE Survey") as further support for the methods and techniques he used in estimating his first alternative estimate of plaintiff's future wage growth (3 percent), as well as the increases in plaintiff's health insurance costs. See Item 94, Exh. 1, Att. G. Specifically, Reiber notes that Question 1 of the NAFE Survey reveals that forensic economists implicitly accept the theory

that historical CPI data can be used to estimate future inflation. Moreover, Reiber observes that 78 percent of the 1996 Survey's respondents indicated that their own 30–year forecast of inflation—much like Reiber's—would be between 3 percent and 4 percent. See Item 94, Exh. 1, ¶¶ 38–44. Similarly, Reiber claims that Question 2 of the NAFE Survey reveals how forensic economists routinely use CPI data to estimate future increases in medical costs. Id. ¶¶ 45–49.

Next, Reiber states that the NAFE Survey also supports the technique he used to derive his alternative wage growth rate of 7.3 percent. See Item 94, Exh. 1, ¶¶ 54–62. Again, Reiber derived this alternative wage growth rate simply by looking to plaintiff's wages from 1992 to 1997. Reiber points to Question 4 of the NAFE Survey in which the Survey's authors simply assumed that forensic economists would periodically calculate an "earnings increase trend from past wage data." See Item 94, Exh. 1, Att. G. In calculating the alternative 7.3 percent growth rate from "past wage data," Reiber employed a "geometric mean" analysis. Reiber acknowledges that many of the Survey's respondents favored the "arithmetic mean" over the geometric mean. Nevertheless, Reiber believes that these two approaches produce substantially similar results and that one is favored over the other only because it is easier for a jury to understand the arithmetic mean. See Item 94, Exh. 1, ¶¶ 58–61.

### 2. Testing of Reiber's Methods on Future Lost Wages.

In addition to the foregoing argument on whether there is scholarly support for

---

**3.** Reiber also admits, however, that forensic economists do not universally agree on "how far back" one should look when using CPI data, and insists this determination is customarily left to the economist's "discretion." Id.

¶ 36. Defendants insist that this is precisely the kind of thing that makes Reiber's proffered testimony patently unreliable. Item 95, ¶¶ 26–27.

Reiber's methods, defendants also argue that Reiber's proffered testimony on future lost wages will be unreliable because Reiber has never bothered to test the accuracy of his methods and techniques. Defendants insist that Reiber could easily conduct such a test by taking a lost future wage projection that he made in 1993 and comparing it with the financial market as it actually evolved between 1994 and 2000.

During his deposition, Reiber admitted that there was a remote possibility that such testing could reveal an error in his methodology if his past projections contained the same·error over and over again. *See* Item 91, Exh. 4, ¶¶ 146–150. However-er, Reiber insists that he does not conduct tests of his past projections and that he knows of no other forensic economists who do. *See* Item 94, Exh. 1, ¶¶ 78–80. Reiber acknowledges that forensic economists are not fortune tellers and that they· cannot hope to project accurately all of the time. Still, Reiber says that experts in this field do the best job possible by applying established economic theories to currently available data and information. Essentially, Reiber responds by saying that "hindsight is 20/20," and ·that forensic economists stand to learn little from the "Monday morning quarterbacking" that Mr. Sliwa prescribes. *See* Item 94, Exh. 1, ¶¶ 78–80.

### C. *Worklife Expectancy*

Defendants also attack the way in which Reiber calculated plaintiff's worklife expectancy.[4] Here, Reiber assumed that plaintiff would have worked until she reached the age of sixty-six (66). In forming his opinion as to worklife expectancy, Reiber took note of the fact that plaintiff did not have a pension plan through her employer and credited plaintiff's statement that she had always intended to ·work until her 66th birthday. Much like· before, ·defendants maintain that the methods and techniques that Reiber has used to calculate worklife expectancy are untested and ·unsupported by scholarly literature.

Reiber, in turn, responds here in much the same way as he had to defendants' other challenges: no scholarly literature is needed to support the theory that the presence or absence of a pension plan will affect a person's worklife expectancy. *See* Item 94, Exh. 1, ¶ 66. Indeed, this appears to be an inference based on common sense. That is, if an employee has a solid pension, then the employee is more likely to retire earlier in life. On the other hand, if an employee does not have a pension, then the employee is likely to work later into life in order to ensure economic stability. As further support for his opinion on plaintiff's worklife expectancy, Reiber cites the NAFE Survey. *See* Item 94, Exh. 1, ¶¶ 67–74. In Question 13 of the Survey, the .authors asked the respondents to report how they determined worklife expectancy. Item 94, Exh. 1, Att. G. Fifty-one percent (51 *percent*) of the respondents reported using the Labor Department's standard worklife tables. In this case, Reiber did not rely on the Labor Department's tables and instead opted to use a "fixed time period" analysis, which only 19 percent of the Survey's respondents favored. *See* Item 94, Exh. 1, ¶ 70.

---

4. Initially, defendants also sought to challenge Reiber's projection of plaintiffs likely annual work hours. Reiber presumed that plaintiff would have worked approximately 1,950 hours annually until she retired. While Reiber initially based his assumption of 1,950 hours on the number of hours set forth in a plaintiff's Employee Handbook (which con- tains a description of plaintiff's job), Reiber has since confirmed that plaintiff had worked 1,950 hours a year since taking the job in 1992. Thus, plaintiff has established a sound basis for Reiber's calculation here. Furthermore, defendants have not pursued this objection in their reply papers.

Reiber claims that the fixed time period theory was justified in this case because of plaintiff's stated intent to work until she turned 66 and because plaintiff had no pension plan with her employer. Again, Reiber claims that information like this often leads forensic economists to eschew the Labor Department's standard tables for the more individualized determination that a fixed time period analysis yields. Item 94, Exh. 1, ¶¶ 71–74.

### D. *Analysis of Reiber's Testimony*

■ In sum, defendant argues that Reiber's methodologies and techniques are unreliable because they fail to satisfy two of the four factors outlined in *Daubert:* the factor relating to publication and peer review and the factor relating to testing the expert's methods. However, none of *Daubert's* four factors is a *sine qua non* of reliability, and the Court there did not intend these factors to serve as a dispositive "checklist." Nevertheless, defendants insist that the deficiencies in Reiber's testimony warrant preclusion of Reiber's proffered testimony.

First, defendants argue that Reiber's proffered opinions are unreliable because Reiber cannot point to books, articles, or other publications that explain or endorse the methods he has used to form his opinions on lost future wages, cost of future health insurance, and worklife expectancy. Defendants state that it is not enough for Reiber to defend his methodologies by claiming that they are well accepted in the field of forensic economics and that all of his techniques derive from "standard, fundamental, rudimentary, run-of-the-mill" economic and mathematical principles.

More specifically, defendants contend that methods are not sufficiently reliable since "the presence of *Daubert's* general acceptance factor [does not] help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for ex-

ample, do theories grounded in any so-called generally accepted principles of astrology or necromancy." 526 U.S. at 151, 119 S.Ct. 1167. Here, defendants cite *Kumho Tire* for the broad proposition that trial courts should afford very little weight to *Daubert's* "general acceptance" factor when determining the reliability of testimony. By arguing in this way, defendants misread *Kumho Tire*. In that case, the Court only cautioned courts not to give any one of *Daubert's* factors undue weight. As an extreme example of what not to do, the Court related that the "general acceptance" factor would mean little if the expert's relevant community was, for example, the field of astrology or magic. Suffice it to say, the discipline of forensic economics is a far cry from astrology, magic, or other dubious fields of "study." Thus, it is quite relevant that forensic economists generally recognize the validity of Reiber's methods and techniques. However, defendants also dispute the idea that Reiber's methods are "generally accepted" by forensic economists. Here, defendants argue that it is far from "axiomatic" that wages track the annual rate of inflation, and that Reiber's insistence on the correlation of inflation and wages is an attempt to render his wage growth rate reliable *ipse dixit*. Next, defendants point out Reiber's concession that there is no standardized number of years that forensic economists use when looking at historical CPI data. Defendants contend that this reveals a lack of general acceptance for Reiber's decision to look at only 10 years of CPI data, as opposed to 20 or 30 years of data. Item 95, ¶¶ 26–27.

On this count, though, it is enough that Reiber identifies the number of years he used and offers a reasoned explanation as to why he used that number of years. Also, Reiber's testimony and the NAFE Survey indicate that there may be several acceptable analytical approaches when it

comes to projecting future economic trends. Furthermore, it appears that reasonable economists can and do differ on the number of past years that should be referenced in the CPI–U when future inflation rates are projected.

Next, defendants argue that the NAFE Survey reveals the forensic economists do not generally agree on future rates of inflation. Item 95, ¶¶ 32–33. However, it is not necessary that economists generally accept the same conclusions—a projected rate of inflation. Instead, it is enough that economists generally accept a certain method—the method of looking at the CPI in order to project future rates of inflation.

Finally, defendants attempt to debunk Reiber's projection of future inflation rates by showing how his past projections—given in other lawsuits—have proven to be inaccurate. Item 95, ¶ 34. Specifically, defendants have submitted transcripts from two state court trials—one from 1995 and the other from 1997—in which Reiber projected future inflation rates that, at least to date, have apparently proven too high in light of what the actual inflation rates were in subsequent years. Similarly, defendants attempt to discredit Reiber's alternative wage growth rate of 7.3 percent, which was taken from plaintiff's wage history, by submitting evidence that plaintiff's employer granted a wage increase of a mere 2 percent in 1999. Item 95, ¶ 43. Yet, the fact that Reiber's wage growth projections have proven inaccurate for one or even several years does not demonstrate that Reiber has based his testimony on mere speculation or conjecture. In any event, this kind of argument is best left to cross-examination, and does not provide a basis for precluding Reiber's testimony in general.

Defendants also object to the fact that Reiber used a "fixed time period" analysis when assessing plaintiff's probable worklife expectancy, since only 19 percent of the NAFE Survey's respondents endorsed this method. Still, the Survey does not show that forensic economists have rejected the fixed time period method as a potentially valid means of projecting worklife expectancy. Moreover, what matters is that Reiber has used an objective method with a traceable analytical basis. The fact that defendants believe that Reiber has used the wrong method and reached the wrong conclusion does not render Reiber's testimony inherently unreliable. Again, these kinds of disagreements are best left to cross-examination.

### E. Case Law Regarding Forensic Economists

There are only a handful of published opinions in which a forensic economist's testimony on lost future wages is discussed relative to *Daubert* and *Kumho Tire*. In a recent decision from the District of Massachusetts, Judge Stearns indicated that an expert economist's testimony as to lost future wages is generally admissible. *See Polaino v. Bayer Corp.*, 122 F.Supp.2d 63, 66–67 (D.Mass.2000). Similarly, a Texas district court admitted the testimony of a forensic economist regarding lost future wages where the expert "based his opinions on the following: ... growth and discount rate tables for wages and interest, life expectancy tables ... [and] worklife expectancy tables...." *Andrade Garcia v. Columbia Medical Center of Sherman*, 996 F.Supp. 617, 622–23 (E.D.Tex.1998) (internal citation omitted).

While not dispositive of the issues now before this court, the decisions in *Polaino* and *Columbia Medical* tend to support the argument that Reiber's testimony is sufficiently reliable under *Daubert* and *Kumho Tire*.

### II. The Motion to Set Aside the Magistrate's Order

■ I will now rule on the plaintiff's motion (Item 85) to revisit and set aside

the Magistrate Judge's order of September 1999 (Item 58). In her order, then Magistrate Judge Carol E. Heckman granted defendants' motion to preclude the testimony of plaintiffs' proffered vocational-rehabilitation expert. At that time, Judge Heckman stated:

> [P]laintiffs have failed to comply with this court's order of April 26, 1999, which directed them to submit Herbert Weber's report by May 14, 1999. Indeed, plaintiffs have simply ignored that order and made no attempt to comply with it.
>
> In response, plaintiffs claim that Mr. Weber has been unable to render an opinion because Frances Coleman has not completed the E.O.C. and VESID job training programs. She has been experiencing health problems unrelated to this litigation which "puts her overall disability from employment in a state of flux." Because of Mr. Weber's inability to complete his expert report, plaintiffs now seek an extension of time in which the report can be completed.
>
> This is similar to the reason plaintiffs gave before, in their response to [defendants'] first motion to preclude. The court's order was quite clear and specific as to plaintiffs' obligation to supply the report, which by now is many months overdue. Accordingly, defendants' motion to preclude the testimony of Herbert Weber is granted.

Item 58, p. 3 (citations omitted).

By the present motion (Item 85), plaintiff asks that this court partly set aside Judge Heckman's discovery order which was issued on September 8, 1999 (Item 58). Mr. Fromen leads off his argument by stating that "[i]n order to appreciate and understand the present necessity for an ... Order permitting Plaintiff to supplement its prior *Expert Disclosure* ..., it is necessary that this Court be apprised of the pertinent procedural history...." Mr. Fromen does more, however, than merely provide an overview of the "pertinent procedural history." Item 85, ¶ 10. Indeed, a significant amount of Mr. Fromen's supporting affidavit is dedicated to an argument that focuses on certain events and incidents, as well as his own mental impressions, that led up to Judge Heckman's order of September 1999, in which Judge Heckman precluded the testimony of plaintiffs' vocational-rehabilitation expert. *See id.* ¶¶ 11–44, 56. Mr. Fromen concludes these arguments by insisting that the order of September 1999 was "rendered[ ] notwithstanding the substantial justification for failure to file an expert report as of [May 14, 1999] from Herbert Weber...." *Id.* ¶ 45.

Arguments of law and fact that were made—or could have been made—as of August 1999 were rejected by Judge Heckman in her order of September 1999. Plaintiffs were obligated to file any objections to Judge Heckman's order of September 1999 within ten days of that order being issued. *See* Federal Rules of Civil Procedure 72(a). By this motion, plaintiffs cannot be heard to object to the Magistrate Judge's order precluding the testimony of their vocational-rehabilitation expert. "[A] party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely...." *Id.* Therefore, this court will not address plaintiffs' current motion to the extent that it raises events that occurred prior to and mental impressions that were held as of August 1999, which is when defendants' second motion to preclude was argued.

■ In light of the foregoing, the sole issue before this court is whether events and conditions that arose after August 1999 provide a basis for allowing plaintiffs' vocational rehabilitation expert to testify. On this count, plaintiffs maintain that there are many "new or changed circum-

stances" that warrant setting aside the September 1999 order. Specifically, plaintiffs point out that: (a) in February 2000, an Administrative Law Judge from the Social Security Administration issued a decision in which he found that Ms. Coleman was totally and permanently disabled and unable to return to work,[5] *see* Item 85, Exh. K, Att. O; (b) in July 2000, Dr. Joseph E. Burran authored a report supporting the position that plaintiff is permanently and totally disabled, *see* Item 85, Exh. K, Att. A; (c) Dr. Philip Stegemann's progress notes from November and December 1999 as well as April 2000 support the position that plaintiff is permanently and totally disabled, *see* Item 85, Exh. K, Att. F; (d) progress notes from the Erie County Medical Center's physical therapy department from April and May 2000 also support the position that plaintiff is permanently and totally disabled, *see id.;* and (e) in late August 2000, plaintiff's vocational expert Alan C. Winship authored a report in which he concluded that plaintiff's vocational disability is permanent and total, *see* Item 85, Exh. M.

The court is not persuaded by plaintiff's recitation of the foregoing "new and changed circumstances." As early as October 1998, plaintiff's counsel was aware that Ms. Coleman might be permanently and totally disabled and unable to return to work. *See* Item 85, ¶ 17–18. Thus, the foregoing evidence confirms what Mr. Fromen suspected over two years ago. That is, the foregoing substantially supports the position that Ms. Coleman is totally and permanently disabled and cannot return to gainful employment.

 However, Judge Heckman did not preclude plaintiff's vocational-rehabilitation expert from testifying[6] based on the fact that there was insufficient evidence of a permanent or total disability or because plaintiff's disability status was "in flux" at that time. Rather, Judge Heckman precluded plaintiff's expert from testifying because of the unexcused failure to comply with the court's scheduling order on expert disclosure. None of the allegedly new and changed circumstances that plaintiff now points to provides a new or different reason for excusing this failure. *See* Item 89, ¶¶ 49–50, 62. For these reasons, plaintiff's present motion is denied.

## CONCLUSION

Plaintiff has shown that Dr. Reiber's challenged testimony is based on established economic theory and a traceable analysis of fact. Contrary to defendants' position, Reiber has not based his testimony on personal opinion, conjecture, or speculation. For the reasons set forth herein, defendants' *Daubert* motion is denied (Item 87). Further, plaintiff's motion to set aside the Magistrate Judge's order of September 1999 precluding the testimony of the vocational expert is denied (Item 85).

So ordered.

---

**5.** On a related note, plaintiffs argue that the relevant circumstances are new and changed by virtue of the medical evidence on which the Social Security Administration's ALJ relied in reaching his decision. *See, e.g.,* Item 85, Exh. K, Atts. I and J.

**6.** For the sake of clarity, the court notes that Judge Heckman precluded vocational expert Herbert Weber from testifying, and that plaintiff now proffers Alan C. Winship as her vocational expert. This change is irrelevant to the court's reasoning. The effect of Judge Heckman's order is to preclude plaintiff from offering the testimony of a vocational-rehabilitation expert. Plaintiff would not be able to evade the effect of the Magistrate's order simply by retaining a new vocational expert in place of Mr. Weber.